## BARRETT v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit.
May 11, 1929.

No. 7751.

James E. Carroll, of St. Louis, Mo., for plaintiff in error.

C. J. Stattler, Asst. U. S. Atty., of St. Louis, Mo. (Louis H. Breuer, U. S. Atty., of Rolla, Mo., on the brief), for the United States.

Before LEWIS, Circuit Judge, and WOODROUGH and McDERMOTT, District Judges.

McDERMOTT, District Judge. This case grows out of the failure of the Federal Home Building Corporation, the plan and activities of which are described in Beck v. United States (C. C. A. No. 7993) 33 F.(2d) 107, this day decided, to which reference is made for a review of the facts.

The defendants Barrett and Beck were tried under the same indictment, and that part of the Beck opinion referring to the indictment is adopted in this case.

Barrett was convicted at the first trial; the jury disagreeing as to Beck. Moreover, the conspiracy count (10) was present in the indictment during the Barrett trial, although dismissed after the conclusion of the evidence but before submission to the jury. The claims of errors on the trial must therefore be separately treated.

1. *The Books of Account.* Reference is made to the Beck opinion as to the admissibility of these books. There was even less identification at this trial of the books of account, for Lister, the bookkeeper who made and identified a few of the entries, was not called as a witness in the Barrett trial, as he was in the Beck trial; nor was his absence accounted for, save that the district attorney's office overlooked subpœnaing him until too late to find him. If the books are necessary evidence, they must be identified as required by the case of Phillips v. U. S. (C. C. A.) 201 F. 259. The objection of Barrett that the corporate books are not binding on him because he is neither an officer nor stockholder of the company is not sound. The government does not offer the books as binding on any one; the government seeks to show how much money came in to the corporation, and where it went, a circumstance bearing on

fraudulent intent. If the books, properly identified, assist in proving that fact, they are admissible whether Barrett knew of the books or not. To make the *fact* of receipts and disbursements material, the government, of course, must show that Barrett knew, at least in general, how the money was being spent. That knowledge is clear as to Beck, for he signed the checks; and doubtless could be found as to Barrett, at least after he became general manager.

2. *The Letters.* The fact that Barrett's name is signed to the letters does not prove he signed them. This evidence is necessary, either by direct proof, admission, or comparison of signatures. Brady v. U. S. (C. C. A.) 24 F.(2d) 399.

3. *The Sufficiency of the Evidence.* Barrett was first a salesman of the company, then sales manager, and then general manager. He shared in the commissions on the sale of contracts, but was not a stockholder in the corporation, and hence not in position to share in the profits of the corporation. He, like Beck, apparently overdrew his account, and the corporation was engaged in building him a house. He personally authorized the salesmen to make certain representations. It must be remembered that, as this case went to the jury, the case was simple: Had Barrett devised a scheme to obtain money by false pretenses or promises? Did he, personally or through another duly authorized, make false pretenses or promises? Did he, personally or through another duly authorized, use the mails in furtherance of such scheme? If this simple charge is kept in mind by counsel, the question he suggests as to Barrett not being a stockholder, and many others, will disappear. Otherwise, the comment made in the Beck Case applies.

4. *The Scope of the Evidence.* As the evidence was going in, the trial court was confronted with a count alleging a conspiracy among six men, and a joint charge of misuse of the mails as to the same six. The court's rulings on the evidence were made in the light of that situation. A great deal of evidence was properly admitted, doubtless with the idea in mind that the jury would be charged that, unless they found the conspiracy, that evidence should be disregarded.

But, with the evidence all in, the government dismissed the conspiracy count; four of the defendants were dismissed, two on motion of the government. Without laying down any hard and fast rule on the matter, we are impressed that it was unfair to the defendant, Barrett, to throw open the gates to all evidence that the government saw fit to offer, including, of course, statements of coconspirators, under either an implied or express promise to connect it up with the defendant, and then abandon the effort. In a trial of this length, it is a practical impossibility to undertake to unscramble the eggs at the close of the trial. The court could not, under these circumstances, go back through all the evidence and pick out the admissible from the inadmissible, and take from the jury the inadmissible; the jury, no matter how intelligent, could not put it out of their mind, if so instructed. The harm had been done. We are not intimating that the conspiracy count was put in the indictment to facilitate the proof of the other charge; but the result to the defendant is the same as if that had been the motive.

Neither do we overlook the fact that, on the question of admissibility of the evidence of statements made by Beck or Barrett as against the other, authority to bind each other may be found in their relationship to the business and to each other; nor the fact that the circumstances are such that it might be found that the defendant authorized or encouraged the salesmen to say anything that would sell a contract. The difficulty with this trial was that the evidence was not let in after such determination; it was let in in light of the conspiracy charge, or by virtue of the doctrine of respondeat superior, as stated by the trial court in the Beck trial. Unless Barrett can in some legal way be connected up with these statements, it seems clear that he cannot be held criminally responsible for every statement or promise made by a salesman who drew upon his imagination, instead of his authority, to close a contract. Evidence of what salesmen said to prospective clients should have been excluded, unless such statements were either authorized or ratified. The authority to render them admissible may be found in the circumstances, in the scope of the plan, or from other pertinent facts, including, of course, the fact that each morning the defendant did explain to the salesmen what they should say. Nor should the defendant escape responsibility for such representations because the precise language authorized was not used. It is urged that a joint scheme to defraud is the equivalent of a conspiracy to defraud; and in many respects this is true. Brady v. U. S. (C. C. A.) 24 F.(2d) 399, 404. It still must be the law that a man may not be criminally held for representations he neither made, authorized, or ratified. Misrepresentations must be traced to the defendant through the doctrines of agency, although a conspiracy or a joint plan to do a certain

thing in a certain way may meet the requirements. See Pandolfo v. U. S., 286 F. 8, loc. cit. 17 (7 C. C. A.); McDonald v. U. S., 241 F. 793 (6 C. C. A.); Shea v. U. S., 251 F. 440 (6th C. C. A.); Whitehead v. U. S., 245 F. 385, 396 (5th C. C. A.); Osborne v. U. S., 17 F.(2d) 247, 249 (9th C. C. A.); Ader v. U. S., 284 F. 13, 29 (7th C. C. A.).

The cause will be reversed and remanded for a new trial.